# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| Nicole Barnes, | |
| Plaintiff, | Case No. 14 C 03116 |
| v. | |
| Northwest Repossession, LLC, Austin Car Credit, Inc., and Bob Soltani, | Judge John Robert Blakey |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

In July 2012, Plaintiff Nicole Barnes ("Plaintiff") purchased a 2003 Buick Park Avenue from Defendant Austin Car Credit, Inc. ("Austin"). In April 2013, Defendant Northwest Repossession, LLC ("Northwest") repossessed the vehicle at Austin's request. Plaintiff alleges that Northwest's repossession was unlawful and now brings suit under both federal and state statutory and common law. On March 10, 2016, Northwest moved for summary judgment on all counts. Northwest's Mot. Summ. J. [90]. The same day, Plaintiff cross-moved for partial summary judgment on the issue of liability as to Count I. Pl.'s Mot. Summ. J. [94]. For the reasons stated below, Northwest's motion [90] is granted in part and denied in part; Plaintiff's motion [94] is granted.

# I.    Background[1]

## A.    Plaintiff's Purchase from Austin

On July 10, 2012, Plaintiff purchased a used 2003 Buick Park Avenue from Austin.  PSOF [96] ¶ 11.  The cash price for the vehicle was $2,600.  PSOF [96] Ex. G.  After added costs for delivery and handling, sales tax, and license plates, the total amount owed to Austin equaled $3,000.  *Id*.; NSOF [92] ¶ 8.

The same day, Plaintiff traded in a used 2000 Mercedes Benz for a $2,000 credit towards the purchase of the Buick, which reduced her amount owed to $1,000.  PSOF [96] ¶¶ 16-17; PSOF [96] Ex. G.  In addition to the trade-in, Plaintiff provided $200 in cash, resulting in a final unpaid balance of $800.  PSOF [96] ¶ 17.  Plaintiff agreed to pay the remaining $800, interest free, in four, bi-weekly payments of $200 starting on August 1, 2012 and ending on September 26, 2012.  *Id*.  The "Memorandum of Installment Sale" provided to Plaintiff at the time of her purchase stated that Austin would impose a $50 late charge on every late payment.  PSOF [96] Ex. G.

## B.    Plaintiff's Payment History

Between July 11, 2012 and late January 2013, Plaintiff failed to make any additional payments to Austin.  PSOF [96] ¶ 19.  As a result, Austin imposed $50 late fees at the beginning of August, September, October, November, December, and

---

[1] The facts are taken from the parties' Local Rule 56.1 statements and accompanying attachments. "NSOF" refers to Northwest's statement of undisputed facts [92], with Plaintiff's responses [133] cited as "R. NSOF."  "PSOF" refers to Plaintiff's Local Rule 56.1 Statement of Facts [96], with Northwest's responses [129] cited as "R. PSOF."  "PSOAF" refers to Plaintiff's Local Rule 56.1 Statement of Additional Facts [133], with Northwest's responses [142] cited as "R. PSOAF."

January, which, according to Austin's account ledger, increased Plaintiff's overall balance to $1100. PSOF [96] Ex. K.

On January 3, 2013, Austin mailed Plaintiff a "Final Notice of Intent to Collect Payment." NSOF [92] Ex. H. The Final Notice identified the 2003 Buick Park Avenue and stated the following:

> This notice is intended for above named or parties with the security/property listed above. This notice is to inform you that the above named or parties are behind on their payments for the sum of $1050.00.[2] Failure to comply will result in repossession of the property and the opportunity to cure the breach. Thank You.

*Id.*

Due to a change of address, Plaintiff did not receive the Final Notice. PSOF [96] ¶ 21. Nevertheless, on January 28, 2013, Robert Jackson ("Jackson"), Plaintiff's boyfriend, made a $100 cash payment to Austin, which reduced her balance to $1,000.[3] *Id.* ¶ 23; PSOF [96] Ex. K; PSOAF [133] Ex. 2 at 2. The same day, Austin gave Plaintiff a $50 late fee credit, further reducing Plaintiff's total unpaid balance to $950. PSOF [96] Ex. K.

Between January 29, 2013 and March 8, 2013, Austin accepted several more $100 cash payments from Jackson.[4] PSOF [96] ¶ 23; PSOF [96] Ex. K; PSOAF [133]

---

[2] It is unclear why, as of January 3, 2013, Austin's account ledger listed Plaintiff's balance as $1100, while the Final Notice stated a balance of $1050. The discrepancy may be attributable to the fact that, generally, Austin's account ledger was not immediately updated. PSOF [96] ¶ 31. Regardless, the inconsistency is not material to the Court's analysis.

[3] The record does not explain why Plaintiff suddenly began making payments in January 2013, particularly if the Final Notice from Austin was never received.

[4] Specifically, Austin's account ledger and receipts indicate $100 cash payments on January 31, February 5, 6, 8, 13, 22, 26, and March 8, 2013. PSOF [96] Ex. K; PSOAF [133] Ex. 2. The parties dispute the total amount of Jackson's payments. Plaintiff alleges that the total payments from

Ex. 2. As of March 8, 2013, Austin's account ledger reflected a remaining balance of $150. PSOF [96] ¶ 24; PSOF [96] Ex. K.

### C. The Alleged Final Payment and Release of Lien

Plaintiff alleges that, on March 11, 2013, Jackson made a final cash payment of $150 for the remaining balance on the Buick. PSOF [96] ¶ 25. Northwest denies that this final payment occurred. R. PSOF [129] ¶ 25.

Northwest admits, however, that the same day, Vicki Thompson ("Thompson"), an Austin employee, signed the Release of Lien section of the Buick's Certificate of Title and gave the Certificate of Title to Jackson. R. PSOF [129] ¶¶ 26-27; PSOF [96] Ex. L. The Release of Lien section states, "[t]he lienholder on the vehicle described in this Certificate does hereby state that the lien is released and discharged." PSOF [96] Ex. L.

Northwest maintains that Thompson's signing of the Release of Lien and her delivery of the Certificate of Title to Jackson was a mistake, a claim Plaintiff disputes. NSOF [92] ¶ 28; R. NSOF [133] ¶ 28. Northwest does not allege, however, that Austin sent additional notices to Plaintiff notifying her of the mistake or demanding immediate payment of the supposed $150 outstanding.

---

Jackson totaled at least $900, PSOF [96] ¶ 23, a claim supported by Austin's receipt records and account ledger. PSOAF [133] Ex. 2; PSOF [96] Ex. K. Northwest asserts that Jackson paid no more than $800. R. PSOF [129] ¶ 23. Ultimately, the dispute is not material to the Court's analysis.

### D. The Repossession of Plaintiff's Vehicle

On or about January 29, 2013, Austin hired Northwest to repossess the Buick from Plaintiff. NSOF [92] ¶ 20; NSOF [92] Ex. I at 6, 11; PSOF [96] Ex. E at 21; PSOF [96] Ex. R at 8. Austin did not maintain a standing contract with Northwest, PSOF [96] ¶ 34, but had hired Northwest approximately thirty times in the past. PSOF [96] Ex. F at 3. Northwest assigned one of its employees, Zach Miller ("Miller"), to the job. NSOF [92] ¶ 31. Austin did not cancel its order to repossess, despite accepting Jackson's late payments between January 28, 2013 and March 8, 2013. *See* NSOF [92] Ex. G at 21:20-22:7; 27:22-29:22.

At approximately 3:00 a.m. on April 30, 2013, Miller located Plaintiff's Buick on the street in front of Plaintiff's residence. NSOF [92] ¶ 31. Without notifying Plaintiff, Miller loaded the vehicle onto his tow truck and began driving away. R. NSOF [133] ¶ 31. At the same time, Jackson, who was residing with Plaintiff, awoke to get a glass of water. PSOF [96] ¶ 40. While up, Jackson saw Plaintiff's Buick being towed down the street. *Id.* Believing that a theft was in progress, Jackson quickly awoke Plaintiff and the two gave chase in another vehicle. *Id.* ¶¶ 42-43. By the time the couple reached Miller's tow truck, Plaintiff and Jackson were approximately two blocks from Plaintiff's residence. NSOF [92] ¶ 35. At that point, Miller was stopped on the side of the road and attempting to re-secure the Buick, which had come unattached, back onto the tow truck. PSOF [96] ¶¶ 44-45.

Jackson pulled the vehicle he was driving in front of the tow truck, boxing it in from the front. *Id.* ¶ 45. Jackson exited his vehicle and approached Miller, who

continued to re-secure the Buick. *Id*. ¶ 46; NSOF [92] ¶ 38. Jackson asked Miller "what the fuck he was doing" with the vehicle. NSOF [92] ¶ 38.

Plaintiff claims that, in response, Miller told him, "I'm repo-ing this bitch." PSOF [96] ¶ 48. Plaintiff further asserts that as Jackson got closer to Miller, Miller pushed Jackson out of the way and returned to the cabin. *Id*. Northwest disputes both of these claims. R. PSOF [129] ¶ 48. The parties agree, however, that Miller never provided Jackson or Plaintiff with any form of identification or repossession paperwork. PSOF [96] ¶ 49.

After re-securing the Buick, Miller placed the truck in reverse, made a U-turn, and drove away in the opposite direction. NSOF [92] ¶ 40. Jackson returned to his vehicle, and he and Plaintiff continued to pursue Miller. *Id*. ¶ 41. Jackson's pursuit of Miller continued for multiple hours, and ended only when Jackson was forced to stop to refuel. *Id*. ¶ 42. Miller ultimately towed the vehicle to Northwest, where it was subsequently returned to Austin. *Id*. ¶ 44.

## II. Legal Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any

material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A court "is not required to grant summary judgment as a matter of law for either side when faced with cross-motions for summary judgment." *Crespo v. Unum Life Ins. Co. of Am.*, 294 F. Supp. 2d 980, 991 (N.D. Ill. 2003) (citing *Market St. Assocs. Ltd. P'ship v. Frey,* 941 F.2d 588, 590 (7th Cir. 1991)). Rather, the court must "evaluate each motion on its merits, resolving factual uncertainties and drawing all reasonable inferences against the movant." *Id.*

## III.   Analysis

Plaintiff's First Amended Complaint [70] alleges four causes of action against Northwest: (1) violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.*; (2) violations of the Illinois Uniform Commercial Code ("Illinois Commercial Code" or "Commercial Code"), 810 ILCS 5/9-601, *et seq.*; (3) violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFDPA"), 815 ILCS 505/2, *et seq.*; and (4) common law tort of trespass to chattel. First Am. Compl. [70]. Each count will be discussed in turn.

### A.   Count I: Violations of the Fair Debt Collection Practices Act

The FDCPA seeks, in part, to "eliminate abusive debt collection practices," 15 U.S.C. § 1692, by regulating "the actions a 'debt collector' is permitted to take in collecting a debt." *Fleming-Dudley v. Legal Investigations, Inc.*, No. 05-CV-4648, 2007 WL 952026, at *4 (N.D. Ill. Mar. 22, 2007). As a consumer protection statute, the FDCPA "is liberally construed in favor of consumers to effect its purpose." *Ramirez v. Apex Fin. Mgmt., LLC*, 567 F. Supp. 2d 1035, 1040 (N.D. Ill. 2008).

Generally, Section 1692a(6) of the FDCPA defines a "debt collector" to include "only those persons or businesses whose principal purpose is the collection of 'debts.'" *Fleming-Dudley*, 2007 WL 952026, at *4. Thus, repossession companies—who seek collection of collateral—are "ordinarily beyond the scope of the FDCPA." *Purkett v. Key Bank USA, Inc.,* No. 01-CV-162, 2001 WL 503050, at *2 (N.D. Ill. May 10, 2001). Section 1692(a)(6), however, contains a limited exception that "[f]or the purpose of section 1692f(6) of this title, [the term 'debt collector'] also includes any person who uses any instrumentality of interstate commerce . . . in any business the principal purpose of which is the enforcement of security interests." 15 U.S.C. § 1692a(6). This "last caveat bears emphasis," because it subjects Northwest to the FDCPA "solely for purposes of § 1692f(6)." *Fleming-Dudley*, 2007 WL 952026, at *4 (emphasis removed) (citing *Jordan v. Kent Recovery Services, Inc.,* 731 F. Supp. 652, 657 (D. Del. 1990) ("Such a purposeful inclusion for one section of the FDCPA implies that the term 'debt collector' does not include an enforcer of a security interest for any other section of the FDCPA.")).

Section 1692f(6) prohibits "[t]aking or threatening to take any nonjudicial action to effect dispossession or disablement of property if—(A) there is no present right to possession of the property claimed as collateral through an enforceable security interest; (B) there is no present intention to take possession of the property; or (C) the property is exempt by law from such dispossession or disablement." 15 U.S.C. § 1692f(6). Here, Plaintiff only alleges violations of subsection (A). First Am. Compl. [70] ¶¶ 114-21.

> To determine whether a debt collector had a present right to possession of the property under § 1692f(6), courts in this district and elsewhere have looked to the applicable state self-help repossession statute.

*Fleming-Dudley*, 2007 WL 952026, at *5. In Illinois, "the applicable self-help repossession statute is § 9-609(b)(2) of the Illinois Commercial Code," *id*., which permits non-judicial repossession of collateral (1) by a secured party; (2) after default; and (3) if the secured party proceeds without breach of the peace. 810 ILCS 5/9-609 ("After default, a secured party . . . may take possession of the collateral . . . without judicial process, if it proceeds without breach of the peace."). Here, based upon the record, Northwest violated § 9-609(b)(2) because: (1) there is insufficient evidence that Austin—and by extension Northwest—was a secured party; and (2) Plaintiff was not in default of her installment agreement at the time of the repossession.

### 1. There Is Insufficient Evidence That Austin Was A Secured Party At the Time of the Repossession

Section 9-609(b)(2) of the Illinois Commercial Code only permits self-help repossession by "a secured party." 810 ILCS 5/9-609 ("[A] *secured party* . . . may take possession of the collateral[.]") (emphasis added). In relevant part, the Commercial Code defines "secured party" as "a person in whose favor a security interest is created or provided for under a security agreement, whether or not any obligation to be secured is outstanding." 810 ILCS 5/9-102.

Generally speaking, a security agreement "is an agreement that creates or provides for a security interest." *Sears, Roebuck & Co. v. Conry*, 748 N.E.2d 1248,

9

1250 (Ill. App. Ct. 2001). It "is the security agreement itself which creates or provides for the security interest." *Magna First Nat. Bank & Trust Co. v. Bank of Illinois in Mt. Vernon*, 553 N.E.2d 64, 66 (Ill. App. Ct. 1990). Under Illinois law, "a security interest attaches only to property described in the security agreement." *Matter of Martin Grinding & Mach. Works, Inc.*, 793 F.2d 592, 594–95 (7th Cir. 1986). By extension, "a security interest cannot exist in the absence of a security agreement." *Allis-Chalmers Corp. v. Staggs*, 453 N.E.2d 145, 148 (Ill. App. Ct. 1983).

As applied to this case, a security interest is enforceable under the Illinois Commercial Code only if "the debtor has authenticated a security agreement that provides a description of the collateral[.]"[5] 810 ILCS 5/9-203(b)(3)(A). Moreover, Austin's transaction with Plaintiff is also "subject to other applicable laws relating to consumers," *id.* at 5/9-201 cmt. 3, including the Illinois Motor Vehicle Retail Installment Sales Act ("IMVRISA"), 815 ILCS 375/1, *et seq.* *Id.* at 5/9-201(b)(2). Under the IMVRISA, every retail installment contract for the purchase of an automobile must be in writing and "clearly state and describe any security taken or retained by the seller." 815 ILCS 374/3-374/4. Furthermore, every vehicle retail installment contract must disclose, as applicable, a "description or identification of the type of any security interest held or to be retained or acquired by the seller in

---

[5] 810 ILCS 5/9-203(b)(3) also allows for enforcement of a security interest if "(B) the collateral is not a certificated security and is in the possession of the secured party under Section 9-313 pursuant to the debtor's security agreement; (C) the collateral is a certificated security in registered form and the security certificate has been delivered to the secured party under Section 8-301 pursuant to the debtor's security agreement; or (D) the collateral is deposit accounts, electronic chattel paper, investment property, letter-of-credit rights, or electronic documents, and the secured party has control under Section 7-106, 9-104, 9-105, 9-106, or 9-107 pursuant to the debtor's security agreement." None of these conditions apply here.

connection with the extension of credit, and a clear identification of the property to which the security interest relates." *Id*. at 375/5.

The "burden of proving that an item of property is subject to a security interest is on the party asserting the interest." *In re Standard Foundry Prod., Inc.*, 206 B.R. 475, 478 (Bankr. N.D. Ill. 1997); *In re S.M. Acquisition Co.*, 319 B.R. 553, 564 (Bankr. N.D. Ill. 2005), *aff'd and remanded*, No. 03-CV-7072, 2005 WL 6292653 (N.D. Ill. Sept. 12, 2005). Because Northwest bears the burden of proof at trial, Plaintiff "is not required to prove a negative in order to make a prima facie showing for summary judgment." *Beamon v. Town of Lyndon*, No. 04-C-0250, 2005 WL 2465904, at *2 (E.D. Wis. Oct. 6, 2005). Rather, Plaintiff must merely "inform the court of 'the basis of its motion and identify those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Id*. (quoting *Celotex*, 477 U.S. at 322). Once such a showing is made, "the party that bears the burden of proof at trial must show that it has admissible evidence to support its claim." *Id*.

Here, Northwest fails to present sufficient evidence of a security agreement that complies with the Illinois Commercial Code, Motor Vehicle Retail Installment Sales Act, or relevant case law. The record before the Court contains only one written "agreement" between Plaintiff and Austin. PSOF [96] Ex. G; NSOF [92] Ex. D. The document, which describes itself as a "Memorandum of Installment Sale" ("the Memorandum"), lists the 2003 Buick purchased by Plaintiff and outlines its

total price, Plaintiff's trade-in allowance and $200 down payment, and her final $800 unpaid balance. *Id.* The document further details the four $200 biweekly installments Plaintiff agreed to pay beginning on August 1, 2012. *Id.* The Memorandum, however, fails to identify any security interest held by Austin in connection with its extension of credit. *See id.*

Admittedly, the Memorandum does reference *other* potentially relevant documents. For example, the Memorandum mentions a separate "Retail Installment Contract" and "Bill of Sale" associated with Plaintiff's purchase. *Id.* Additionally, the Memorandum states that Plaintiff's unpaid balance and other charges "are secured by a retail installment contract and judgment note executed by the undersigned on this date." *Id.* Northwest, however, fails to provide copies of these collateral agreements.

Of course, "where an instrument is lost or destroyed, its contents may be proved by secondary evidence." *Orne v. Cook*, 31 Ill. 238, 242-43 (1863). To this end, documents in the record imply the *possible* existence of Austin's security interest. In addition to the Memorandum of Installment Sale, the Final Notice sent in January 2013 states that "[f]ailure to comply will result in repossession of the property and the opportunity to cure the breach." NSOF [92] Ex. H. Similarly, the Buick's Certificate of Title lists Austin as a lienholder, at least until its supposed release on March 11, 2013. PSOF [96] Ex. L. These tangential references in the record, however, are not sufficient to create a triable issue. Even though oral agreements to "create a security interest have been found valid where other

documents relating to the transaction evidenced the intent of the parties," *Turk v. Wright & Babcock, Ltd.*, 528 N.E.2d 993, 994 (Ill. App. Ct. 1988), no evidence of such a verbal contract is presented here. To the contrary, the Memorandum of Installment Sale states that together, the Memorandum and Retail Installment Contract "constitute the entire agreement" between Plaintiff and Austin. PSOF [96] Ex. G.

In the end, the "mere possibility that a factual dispute may exist, without more, is an insufficient basis upon which to justify denial of a motion for summary judgment." *Posey v. Skyline Corp.*, 702 F.2d 102, 106 (7th Cir. 1983). Northwest fails to adequately prove that Austin held a valid security interest in Plaintiff's Buick at the time it was repossessed. Absent a secured interest in the vehicle, Northwest does not qualify as a secured party, and thus cannot invoke § 9-609(b)(2) of the Commercial Code.

### 2. Even Assuming, *Arguendo*, That Austin Held A Valid Security Interest In Plaintiff's Buick, Plaintiff Was Not In Default Of Her Installment Agreement At The Time Of Northwest's Repossession

#### a) *Plaintiff Was Not In Default Because Her Original Balance Had Been Paid And Austin's Late Fees Were Unlawfully Excessive*

Section 9-609(b)(2) of the Illinois Commercial Code sanctions self-help repossession only "[a]fter default." 810 ILCS 5/9-609. To begin, Plaintiff alleges that by the time her Buick was repossessed in April 2013, she had already paid the entirety of her original loan balance *and* all assessed late fees. *See* PSOF [96] ¶ 25. According to Plaintiff, Jackson provided a final $150 cash payment to Austin on

March 11, 2013 that extinguished Austin's—and by extension, Northwest's—present right to possession. *Id*. Plaintiff's claim is supported by the undisputed fact that the same day, Vicki Thompson signed the Release of Lien section of the Buick's Certificate of Title and gave the Certificate of Title to Jackson. *Id*. ¶¶ 26-27; PSOF [96] Ex. L.

Nevertheless, Northwest disputes that Jackson made a final $150 payment. R. PSOF [129] ¶ 25. Northwest's contention finds at least some support in the record. During her deposition, Vicki Thompson denied that such a payment had been made, and maintained that her signing of the Release of Lien was a mistake. PSOF [96] Ex. M at 19:15-21, 20:25-21:19; NSOF [92] ¶ 28; R. NSOF [133] ¶ 28. At this stage, the Court cannot resolve such genuine factual disputes. *Harris v. comScore, Inc.*, 825 F. Supp. 2d 924, 927 (N.D. Ill. 2011).

These controversies, however, do not foreclose summary judgment. Both Plaintiff and Northwest agree that, between July 11, 2013 and the time of the repossession, Plaintiff made *at least* $800 in additional payments to Austin. PSOF [96] ¶ 23; R. PSOF [129] ¶ 23. It is undisputed that these payments satisfied Plaintiff's original unpaid balance; the only amount outstanding derived from the monthly late charges imposed by Austin between August and January. PSOF [96] Ex. K. These fees, however, were unlawfully excessive.

Under the IMVRISA, delinquency charges on installments of $200 or less may not exceed $10. 815 ILCS 375/11. Moreover, only one delinquency charge may be collected on any installment, regardless of the period during which it remains in

14

default.  *Id*.  As a result, Austin could legally impose no more than a $60 total late fee on Plaintiff, $10 for each of the six months in which Plaintiff failed to make timely payment.  This amount is well below the $50 charge Austin imposed *each month*.

A failure to comply with the provisions of the IMVRISA, of course, does not render Plaintiff's installment contract void or unenforceable.  *Route 50 Auto Sales, Inc. v. Muncy*, 771 N.E.2d 635, 637 (Ill. App. Ct. 2002).  The noncomplying party, however, is subject to the penalties provided in the statute.  *Fandel v. Allen*, 937 N.E.2d 1124, 1133 (Ill. App. Ct. 2010).  By statute, no person who violates the IMVRISA, except as a result of an accident or bona fide error of computation, "may recover *any* unpaid finance charge, delinquency or collection charge, or refinance charge in connection with the related retail installment contract."  815 ILCS 375/24 (emphasis added).  Therefore, as a matter of law, Austin was not entitled to *any* amount above Plaintiff's original $800 balance.  Consequently, Plaintiff ceased being in default of her purchase agreement on February 26, 2013—the day Jackson's cash payments equaled $800—more than two months before Northwest's repossession on April 30, 2013.  PSOF [96] Ex. K.  Without a prerequisite default, Northwest was not entitled to resort to self-help repossession.

### b)  *Plaintiff Was Not In Default Because Austin Suspended Its Right To Timely Payments*

Even assuming, a*rguendo*, that Austin's late fees were not unlawfully excessive, under Illinois law, "a contracting party may waive provisions beneficial to it or waive strict compliance by conduct or actions 'indicating that strict compliance

with a particular provision will not be required.'" *In re Krueger*, 192 F.3d 733, 738

(7th Cir. 1999) (quoting *Barker v. Leonard,* 635 N.E.2d 846, 848 (Ill. App. Ct. 1994)).

Specifically,

> [w]here a party accepts late payments it may waive or suspend its right to timely payments and its right to declare a forfeiture unless the buyer is given a definite and written notice of the intention to require strict compliance with the contract in the future . . . To reestablish strict compliance, the notice must give a reasonable time for performance, and what is a reasonable time depends on the facts in the case.

*City of Chicago v. Chicago Title & Trust Co.*, 563 N.E.2d 65, 70 (Ill. App. Ct. 1990)

(quoting *Allabastro v. Wheaton National Bank*, 395 N.E.2d 1212, 1217 (Ill. App. Ct.

1979)).

> The failure to make payments within the contract time may be waived by the receipt and acceptance of overdue payments. Where the time fixed by the contract for performance is permitted to pass, both parties concurring, the time of performance thereafter becomes indefinite and one party cannot rescind until full notice and a reasonable time for performance is given.

Romualdo P. Eclavea, et al., *Waiver of Delay: Generally,* 12A Ill. Law and Prac.

Contracts § 279 (2016).

Here, Austin sent its Final Notice to Plaintiff on January 3, 2013. In it,

Austin informed Plaintiff that she "was behind on [her] payments" and that

"[f]ailure to comply" would result in repossession of her Buick. NSOF [92] Ex. H.

Plaintiff (through Jackson) however, made multiple efforts to comply with her

purchase agreement by making at least eight $100 payments between January 28,

2013 and March 8, 2013. PSOF [96] ¶ 23; R. PSOF [129] ¶ 23. It is undisputed that

Austin not only accepted these payments, but released the Certificate of Title for

the Buick to Jackson on March 11, 2013. PSOF [96] Ex. K; PSOAF [133] Ex. 2; R. PSOF [129] ¶¶ 26-27. Although Austin and Northwest maintain that this release was a mistake, they never communicated their belief to Plaintiff. Moreover, Austin never gave notice—written or otherwise—that they were once again requiring strict compliance regarding their expected $150 remaining balance. Rather, both Austin and Northwest remained silent towards Plaintiff up until the moment Miller hooked Plaintiff's Buick to his tow truck in the dead of night at 3:00 a.m. on April 30, 2013. Such facts are insufficient to declare Plaintiff in default of her purchase agreement. Absent a default, Northwest was foreclosed from pursuing self-help repossession.

In sum, Northwest violated § 9-609(b)(2) of Illinois' self-help repossession statute because: (1) there is insufficient evidence that Austin—and by extension Northwest—was a secured party; and (2) Plaintiff was not in default of her installment agreement at the time of the repossession. As a result, neither Northwest nor Austin had a present right to possession of Plaintiff's Buick on April 30, 2013. Consequently, Northwest violated § 1692f(6) of the FDCPA.[6]

### 3. Northwest Does Not Raise A Viable Bona Fide Error Defense

Northwest contests that, even if Plaintiff can establish a violation of the FDCPA, a question of fact exists regarding Northwest's bona fide error defense.

---

[6] In her motion, Plaintiff raises several other theories challenging Northwest's present right to possession, including: (1) the events of April 30, 2013 constituted a breach of the peace; (2) Northwest violated the Illinois Collateral Recovery Act, 225 ILCS 422/1 *et seq.*; and (3) Thompson released Austin's lien and transferred the Certificate of Title to Jackson on March 11, 2013. Pl.'s Mem. Supp. Mot. Summ. J. [95] 12-15; Pl.'s Reply [143] 11-12. Given the Court's rulings *supra*, it need not address these supplemental arguments.

Northwest's Resp. Pl.'s Mot. Summ. J. [128] 13. According to Northwest, "Austin Credit never cancelled its repossession order with Northwest. As such, Northwest had no reason to believe it should not proceed with the repossession ordered by Austin Credit." *Id.* (citation omitted). Northwest's arguments are unavailing.

A debt collector may not be held liable under the FDCPA if the debt collector shows "that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c). To qualify for the bona fide error defense, Northwest must show that: (1) the presumed FDCPA violation was not intentional; (2) the presumed FDCPA violation resulted from a bona fide error; and (3) it maintained procedures reasonably adapted to avoid any such error. *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 537 (7th Cir. 2005).

Regarding the first prong, a debt collector "need only show that its FDCPA violation was unintentional, not that its actions were unintentional." *Id.* (citing *Nielsen v. Dickerson,* 307 F.3d 623, 641 (7th Cir. 2002) (debt collector "may avail itself of the bona fide error defense because it had no intent to violate the FDCPA, although its actions were deliberate"); *Lewis v. ACB Bus. Servs., Inc.,* 135 F.3d 389, 402 (6th Cir. 1998) ("The debt collector must only show that the violation was unintentional, not that the communication itself was unintentional. To hold otherwise would effectively negate the bona fide error defense.")).

Regarding the second prong, a "bona fide error" is "an error made in good faith; a genuine mistake, as opposed to a contrived mistake." *Id.* at 538.

As to the third prong, the "mere assertion of good intent, absent a factual showing of actual safeguards reasonably adopted to avoid violations of the FDCPA, is insufficient to sustain the [bona fide error] defense." *Jenkins v. Union Corp.*, 999 F. Supp. 1120, 1141 (N.D. Ill. 1998) (internal quotations omitted). Other circuits have adopted a "two-step inquiry" for this procedural component. "The first step is whether the debt collector maintained—i.e., actually employed or implemented—procedures to avoid errors. The second step is whether the procedures were reasonably adapted to avoid the specific error at issue." *Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1274 (11th Cir. 2011) (citing *Reichert v. Nat'l Credit Sys. Inc.,* 531 F.3d 1002, 1006 (9th Cir .2008); *Johnson v. Riddle,* 443 F.3d 723, 729 (10th Cir. 2006)) (internal quotations omitted). Whether a debt collector's procedures are reasonably adapted to avoid certain errors "depends upon the particular facts and circumstances of each case." *Id.* Section 1692k(c) "does not require debt collectors to take every conceivable precaution to avoid errors; rather, it only requires reasonable precaution." *Kort*, 394 F.3d. at 539; *Hyman v. Tate,* 362 F.3d 965, 968 (7th Cir. 2004) ("Although [the debt collector] could have done more . . . § 1692k(c) only requires collectors to adopt reasonable procedures.").

Here, Northwest fails to show implemented procedures reasonably designed to avoid the mistake made in this case: repossession of a vehicle without a valid security interest. To the contrary, the evidence before the Court evinces Northwest's proverbial "head in the sand" tendencies. The entirety of Northwest's

procedure for accepting repossession orders consists of only five steps contained on a single piece of paper:

> PROCEDURES FOR ENTERING IN A VEHICLE TO BE REPOSSESSED
>
> [1] FINANCE COMPANY WILL EITHER FAX/EMAIL A COPY OF THE DOCUMENTS AND INFORMATION FOR THE DEBTOR AND VEHICLE THAT HAS NOT BEEN PAID FOR.
>
> [2] WE THEN ENTER THE INFORMATION INTO OUR RECOVERY DATABASE SYSTEM
>
> [3] ONCE IT IS ENTERED INTO OUR SYSTEM WE THEN RUN THE DEBTOR THRU OUR SKIP TRACING SYSTEM TO MAKE SURE THAT THEY ARE NOT IN BANKRUPCY.
>
> [4] ANY OTHER ADDITIONAL ADDRESSES THAT WE FIND ON THE SKIP TRACING SYSTEM [ARE] ENTERED INTO OUR RECOVERY DATABASE SYSTEM.
>
> [5] AT THIS TIME THE REPOSSESSION AGENT WILL START TO RECOVER THE VEHICLE *AND WILL NOT STOP UNTIL THE FINANCE COMPANY NOTIFIES US THAT THE DEBTOR HAS PAID CURRENT ON THEIR LOAN*.

PSOF [96] Ex. R at 7 (emphasis added). None of the above efforts can be reasonably expected to avoid the error committed here. Although the procedures describe "documents and information for the debtor" to be supplied by the finance company, they do not delineate what those documents must encompass, nor demand that proof of a valid security interest be included, or other relevant procedure. Warren Crum ("Crum"), the owner of Northwest, testified that Northwest's standard practice is to ask the creditor for a copy of the bill of sale and title to the vehicle. NSOF [92] Ex. J at 213:12-19. His assertion, however, is betrayed by Northwest's admission that it did not possess a copy of the title for Plaintiff's vehicle at any

point prior to its repossession.  PSOF [96] ¶ 33.  Rather, Northwest only received a copy of the Final Notice sent to Plaintiff on January 3, 2013.  PSOF [96] Ex. R. at 9. This notice, however, does not provide evidence of a valid security interest, let alone one valid at the time of Northwest's repossession over three months later.

Furthermore, although Northwest conducts its own "skip tracing," its own expert acknowledged that such a search—as conducted by Northwest—does not by itself reveal the presence (or absence) of a security interest:

> Q. May I ask you how skip tracing is meant to double-check the existence of a lien?
>
> A. It is not.
>
> Q. Are you sure of that?
>
> A. Well, the way—the way I understand the word is to locate a person.
>
> . . .
>
> Q. All right. So when we're talking about skip tracing, skip tracing is actually to locate a person, not to—as distinct from an asset search of a person.  Is that correct?
>
> A. That's how I view it as.

Indeed, Northwest admits that, ultimately, its procedure for confirming the existence of a security interest on collateral is merely to "rely on Austin Car Credit[.]"  PSOF [96] ¶ 56.  Crum testified at his deposition:

> Q. . . . What procedures do you have in place that are designed to ensure that you are not taking action to repossess a vehicle where that vehicle has been paid off, or otherwise had the lien released subsequent to it being assigned to your company?
>
> A. There is no possible way for us to do so, so we have no policy as such.

NSOF [92] Ex. J at 228:7-13.

Admittedly, the Seventh Circuit has previously held that "the FDCPA does not require collectors to independently verify the validity of the debt to qualify for the 'bona fide error' defense." *Hyman v. Tate*, 362 F.3d 965, 968 (7th Cir. 2004). In *Hyman*, the plaintiff incurred a credit card debt she subsequently listed in a Chapter 13 bankruptcy petition. *Id*. at 966. Subsequently, the creditor bank referred the plaintiff's debt to a debt collector. *Id*. The collector, ignorant of the plaintiff's bankruptcy filing, sent a collection letter to the plaintiff. *Id*. Upon receipt, the plaintiff telephoned the collection agency and informed them of her pending bankruptcy. *Id*. The agency immediately closed the plaintiff's account and ceased further collection attempts. *Id*. Nevertheless, the plaintiff filed suit against the collection agency alleging violations of the FDCPA. At trial, the district court concluded that the agency's letter, even if in technical violation of the FDCPA, constituted a bona fide error. *Id*. The Seventh Circuit affirmed that the district court's findings were not clear error. *Id*. at 969.

Several factors present in *Hyman*, however, do not exist in the case before this Court. First, *Hyman* applied a clear error test, a deferential standard of review not present at this stage of the proceedings. Second, in *Hyman*, the collection agency's General Manager testified that, as a general practice, no creditor "would send them bankruptcy accounts because that is just not good business to do that." *Id*. at 967. Northwest offers no such testimony here. Third, the General Manager in *Hyman* testified that if the creditor received information that a previously

22

referred account was in bankruptcy, "the bank would promptly notify" the collection agency. *Id.* The opposite is true in this case. Thompson, an Austin employee, testified that if a debtor obtains clear title to a vehicle *after* an order for repossession has been placed, Austin does *not* proactively contact Northwest. R. PSOAF [142] Ex. G. at 27:12-29:16. Rather, Austin waits until *Northwest* sends *them* a list of pending repossession orders, at which point Austin removes those for which it no longer maintains a present right to possess. *Id.* Bob Soltani ("Soltani"), Austin's owner, however, testified that Northwest would only send such a list "every month," NSOF [92] Ex. C at 40:1-4, a far cry from the "prompt notification" ratified in *Hyman*. Finally, the collection agency in *Hyman* presented evidence that, of the accounts referred to it for collection, only .01 percent were later found to have been in bankruptcy. *Id.* Here, Crum testified that, in his experience, "less than five percent" of repossessions involved a vehicle with a satisfied loan, NSOF [92] Ex. J at 260:2-9, a figure approximately 500 times greater. In short, the circumstances supporting the Seventh Circuit's decision in *Hyman* are missing in the present controversy.

A sister court in this district has distinguished *Hyman* on similar grounds. In *Turner v. J.V.D.B. & Associates, Inc.*, the plaintiff's debt to a phone service company was discharged through a Chapter 7 bankruptcy petition. 318 F. Supp. 2d 681, 682 (N.D. Ill. 2004). Nevertheless, as in *Hyman*, the creditor mistakenly turned the debt over to a debt collector, who then sent a collection letter to the plaintiff. *Id.* The plaintiff filed suit under the FDCPA. *Id.* at 683. At trial, the

district court distinguished *Hyman* on many of the grounds listed *supra* and dismissed the collection agency's bona fide error defense at the summary judgment phase. *Id.* at 687. According to the court:

> In *Hyman,* unlike here, the debt collector had a written contract with the creditor and an understanding with the creditor that the creditor would not send over bankruptcy accounts . . . [The collection agency] has not even alleged, let alone offered any evidence, that it had a written agreement or any type of understanding with its creditor-clients that clients would not send [the collection agency] accounts on debts which were subject to bankruptcy petitions. Moreover, [the collection agency] has not shown that its creditor-clients would immediately contact [the collection agency] if an account subject to bankruptcy erroneously slipped through the process (and [the collection agency] has proffered no evidence of very infrequent reference of bankruptcy accounts to [the collection agency] for collection). In these circumstances, [the collection agency's] self-proclaimed but baseless "reliance" on its creditor-clients not to send accounts on debts which were subject to bankruptcy petitions was not reasonable, nor was it a procedure reasonably adapted to avoid violating the FDCPA.

*Id.*; *see also Reichert v. Nat'l Credit Sys., Inc.*, 531 F.3d 1002, 1006 (9th Cir. 2008); *Eide v. Colltech, Inc.*, 987 F. Supp. 2d 951, 967 (D. Minn. 2013) ("Although reliance on a creditor to report to the debt collector which accounts have been discharged in bankruptcy may constitute a reasonable procedure 'the bona fide error defense does not protect a debt collector whose reliance on a creditor's representation is unreasonable.'") (quoting *Bacelli v. MFP, Inc.*, 729 F. Supp. 2d 1328, 1334 (M.D. Fla. 2010)).

Rather than the wholly distinguishable circumstances in *Hyman*, the Court finds this case more akin to *Buzzell v. Citizens Auto. Fin., Inc.*, 802 F. Supp. 2d 1014 (D. Minn. 2011). In *Buzzell*, the plaintiff financed a vehicle purchase with a loan

from an automobile finance company. *Id.* at 1016. The plaintiff made a series of late payments and eventually fell behind on his account. *Id.* at 1017. Subsequently, the plaintiff's creditor sent the plaintiff a final notice demanding that plaintiff make his account current. *Id.* Though the creditor continued to accept late and partial payments, the plaintiff remained at least one month behind. *Id.* Eventually, the creditor repossessed the vehicle. *Id.* In response, the plaintiff made additional payments and regained possession of the automobile, but after further late and partial payments, the creditor repossessed the vehicle a second time. *Id.* The plaintiff sued, alleging violations of the FDCPA.

At trial, the district court held that the creditor's "acceptance of late, partial payments . . . necessitated further notice before it had a right to repossess the vehicle." *Id.* at 1022. The creditor's violation notwithstanding, the repossession contractor and agent argued that they "had the right to rely on the so-called 'repossession order' they received from [the creditor] as a representation of its present right to possession." *Id.* at 1023. Rejecting the defendants' claim as a matter of law, the court found that, in reality, the creditor "made no representation about its right to possess the vehicle." *Id.* Rather, the "only information provided to [the repossession contractor] was the 'repossession order,' a one-page document prepared by [the creditor] . . . which contained vehicle information and [the plaintiff's] name and last known address." *Id.* The court further noted that the FDCPA "is a broad remedial statute that imposes strict liability on debt collectors" and that "its terms are to be applied in a liberal manner." *Id.* (internal quotation

omitted).  The court found that "it is inconsistent with the broad remedial purposes of the FDCPA to allow a repossession company to escape liability under § 1692f(6) simply because it received a repossession order from a creditor, which it blindly followed without any assurance of the creditor's present right to possess."  *Id*.  On these facts, the Court agrees.  Therefore, Plaintiff's motion  for  partial  summary judgment on the issue of liability as to Count I [94] is granted.

### B.  Count II: Violations of the Illinois Uniform Commercial Code

In Count II, Plaintiff seeks damages from Northwest for violations of § 9-609 of the Illinois Commercial Code.  That section, however, only provides for liability against *secured* parties.  *Purkett v. Key Bank USA, Inc.*, No. 01-CV-162, 2001 WL 503050, at *4 (N.D. Ill. May 10, 2001).  There is no evidence that Northwest possessed a secured interest in Plaintiff's Buick.  As a result, § 9-609 is inapplicable.

In *Purkett*, the plaintiff entered into a vehicle finance agreement.  *Id*. at *1. Although the plaintiff was current on his account, the bank in possession of the plaintiff's loan agreement hired a repossession company to repossess the plaintiff's vehicle.  *Id*.  The repossession company broke into the plaintiff's locked garage, took his vehicle, and charged the plaintiff a $140 storage fee before relinquishing the vehicle back to the plaintiff.  *Id*.  The plaintiff filed suit against the repossession company, alleging violations of the precursor to § 9-609.  The court dismissed the claim because the repossession company was not a secured party, and thus the relevant section of the Uniform Commercial Code did not apply.  *Id*. at *4.

The comments to the current § 9-609 are consistent with *Purkett*: "courts should hold the *secured party* responsible for the actions of others taken on the secured party's behalf, including independent contractors engaged by the secured party to take possession of collateral." 810 ILCS 5/9-609.

Because Northwest is not, and never was, a secured party in this case, § 9-609 does not apply. Therefore, Northwest's motion [90] as it relates to Count II is granted.[7]

## C.    Count III:  Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act

In Count III, Plaintiff claims Northwest violated § 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"). The ICFA is a "regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Siegel v. Shell Oil Co.,* 612 F.3d 932, 934 (7th Cir. 2010) (quoting *Robinson v. Toyota Motor Credit Corp.,* 775 N.E.2d 951, 960 (Ill. 2002)). The statute "provides redress for deceptive business practices and also for business practices that, while not deceptive, are unfair." *See id.*

Northwest claims it is entitled to summary judgment on Count III because Plaintiff does not qualify as a "consumer" under the ICFA. Northwest's Mem. Supp. Mot. Summ. J. [91] 9-11. Plaintiff failed to respond to this argument. By failing to respond, Plaintiff concedes that Northwest is entitled to summary judgment. *See*

---

[7] The Court notes that, aside from the above analysis, Plaintiff failed to respond to Northwest's motion as it relates to Count II. Therefore, as with Count III, Plaintiff concedes that Northwest is entitled to summary judgment.

*Bombard v. Fort Wayne Newspapers, Inc.,* 92 F.3d 560, 562 n. 2 (7th Cir. 1996) (holding that plaintiff abandons a claim after failing to respond to arguments on that claim in defendant's motion for summary judgment); *Kowalczyk v. Walgreen Co.,* No. 03-CV-8335, 2005 WL 1176599, at *11 (N.D. Ill. May 17, 2005); *Liviak v. Gary Little Nissan, Inc.,* No. 97-CV-6679, 1998 WL 378427, at *9 (N.D. Ill. July 1, 1998); *Brown v. N. Trust Bank,* No. 95-CV-7559, 1997 WL 543098, at *3 (N.D. Ill. Sept. 2, 1997); *Oak Brook Hotel Co. v. Teachers Ins. & Annuity Ass'n of Am.,* 846 F. Supp. 634, 641 (N.D. Ill. 1994). Therefore, Northwest's motion [90] as it relates to Count III is granted.

### D. Count IV: Trespass to Chattel

In Count IV, Plaintiff alleges that Northwest's repossession constituted an unlawful trespass to chattel. First Am. Compl. [70] ¶¶ 146-51. The common law tort "provides redress for unauthorized use of or intermeddling with another's physical property." *Fidlar Techs. v. LPS Real Estate Data Sols., Inc.,* 82 F. Supp. 3d 844, 859 (C.D. Ill. 2015), *aff'd,* 810 F.3d 1075 (7th Cir. 2016). Under Illinois law, "an injury to or interference with possession, with or without physical force, constitutes a trespass to personal property." *Smith v. City of Chicago,* 143 F. Supp. 3d 741, 761 (N.D. Ill. 2015) (quoting *Sotelo v. DirectRevenue, LLC,* 384 F. Supp. 2d 1219, 1229 (N.D. Ill. 2005)). A trespass to a chattel "may be committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another." *Frazier v. U.S. Bank Nat. Ass'n,* No. 11-CV-8775, 2013 WL 1337263, at *11 (N.D. Ill. Mar. 29, 2013); Restatement

(Second) of Torts § 217 (1965). In other words, "harm to the personal property or diminution of its quality, condition, or value as a result of a defendant's use can result in liability." *Smith*, 143 F. Supp. 3d at 761.

In support of its summary judgment motion, Northwest first argues that Plaintiff's claim fails because "trespass to chattels is an intentional tort," and "Northwest had no knowledge that Austin Credit had tendered title to the [Buick] to a third party." Northwest's Mem. Supp. Mot. Summ. J. [91] 14. Northwest's interpretation of the tort's intent requirement misses the mark. While is true that the tort "has come to be limited to intentional interferences," such an intention "is present when an act is done for the purpose of using or otherwise intermeddling with a chattel or with knowledge that such an intermeddling will, to a substantial certainty, result from the act." Restatement (Second) of Torts § 217, cmts. b, c (1965). It is not necessary, however, "that the actor should know or have reason to know that such intermeddling is a violation of the possessory rights of another." *Id.* at cmt. c. It "is immaterial that the actor intermeddles with the chattel under a mistake of law or fact which has led him to believe that he is the possessor of it or that the possessor has consented to his dealing with it." *Id.*; *Madison Capital Co., LLC v. S & S Salvage, LLC*, 765 F. Supp. 2d 923, 936 (W.D. Ky. 2011) ("[A] claim for trespass only requires that the defendant intend to use the chattel. The necessary intent is present even when a defendant interferes with a possessory right under a mistake of law or fact which leads him to believe his action is privileged.").

Alternatively, Northwest claims that, its intent notwithstanding, Austin continued to maintain an enforceable security interest in the Buick at the time of Northwest's repossession. Northwest's Mem. Supp. Mot. Summ. J. [91] 14. For the reasons discussed *supra*, as a matter of law, Northwest is incorrect. Therefore, Northwest's motion [90] as it relates to Count IV is denied.

## IV.    Conclusion

Northwest's Motion for Summary Judgment [90] is granted as it relates to Counts II and III, but denied as it relates to Counts I and IV. Plaintiff's motion for partial summary judgment on the issue of liability as to Count I [94] is granted.


IT IS SO ORDERED

Dated:  September 26, 2016

Entered:

John Robert Blakey
United States District Judge